26 So.2d 481

PHFEE–FEE FARMS, Inc., et al. v. OIL CITY BANK et al.

No. 37639.

April 22, 1946.

Rehearing Denied May 27, 1946.

Armand W. Roos and Wilson & Abramson, all of Shreveport, for plaintiffs-appellants.

Cook, Clark & Egan, of Shreveport, for defendants and appellees.

FOURNET, Justice.

This is a suit for the damages allegedly resulting from the wrongful seizure and conversion of the property of the plaintiffs, PhFee-Fee Farms, Inc., and J. L. Polk, and they are appealing from the judgment ordering its dismissal.

The facts and issues of the case are fully and accurately stated and, in our opinion, correctly disposed of by the trial judge in a well-considered written opinion, from which we quote the following:

"Plaintiffs, alleging ownership, under a title derived from M. L. Clement, of an oil, gas and mineral sub-lease covering a certain 100-acre tract of land in Caddo Parish described in the petition and, also, ownership of certain casing, tubing and equipment on said sub-lease and in an oil well situated thereon, bring this suit against defendants Oil City Bank and J. H. Flournoy, Sheriff, for $27,488.00 damages claimed as the result of the alleged wrongful and illegal seizure and sale under a writ of fieri facias issued in execution of a judgment obtained by Oil City Bank against * * * M. L. Clement in the case of Oil City Bank v. M. L. Clement, No. 78,653 on the docket of this Court. Plaintiffs allege that the property seized and sold as the property of M. L. Clement, the judgment debtor, was not the property of said Clement, but was owned by plaintiffs. They further allege that, among the property so seized, were the casing, tubing, and other pumping equipment in and on an oil well, alleged to be a commercial producer, situated on said sub-

lease; that, at the sale, the defendant, Oil City Bank, became the purchaser of the property seized and sold, and thereafter sold the same to one H. T. Manning, who went upon said sub-lease and 'pulled said well', that is, removed therefrom the casing, tubing and other pumping equipment, thereby ruining and destroying the well. Plaintiffs allege that said seizure and sale were made over their protest and notice repeatedly communicated to defendants that they (plaintiffs) and not M. L. Clement owned the property so seized and sold. Plaintiffs itemize their claimed damages as follows: 1. Equipment removed $8,338.00; 2. Value of the well and loss of oil therefrom $15,000.00; 3. Cost of drilling a replacement well necessary to preserve the sub-lease $4,150.00, totalling $27,488.00.

"Defendants, answering, deny the ownership in plaintiffs of the said sub-lease, the well and equipment thereon and deny that the seizure and sale were wrongfully and illegally made.

"The controversy in this case arises out of the following sequence of events and transactions:

"On September 10, 1937, Gulf Refining Company, lessee in an oil, gas and mineral lease from the Board of Commissioners of Caddo Levee District, duly recorded and covering lands in Caddo Parish, executed a conveyance and transfer of its right, title and interest in said lease 'only in so far as said lease covers and applies to the

right and *privilege* of conducting operations thereunder for the discovery and production of minerals at a depth equal to, but not below, the producing Woodbine horizon, and then in so far only as said lease covers and applies to the North one hundred acres of the land described herein' unto Mrs O. P. Clement, referred to therein as Assignee. Assignee agreed to faithfully carry out all of the provisions of the original lease in so far as it applied to the lands and interest covered by the transfer and, also, to commence within thirty days and, thereafter, with reasonable diligence to complete, the drilling of a well in search for oil or gas on the one hundred acres of land aforesaid as an offset to wells on adjoining lands. This transfer, duly recorded, provided that 'It is understood between the parties to this agreement that Assignee shall not assign the rights conveyed hereunder in whole or in part, and will not sub-lease the aforesaid premises in whole or in part, and that at the expiration or termination of all operations by Assignee hereunder, the rights herein conveyed shall revert to Assignor.'

"According to the testimony of Mr. M. L. Clement, a witness for plaintiffs and a son of the said Mrs. O. P. Clement, a well, known as Well No. 1, was drilled on the premises, beginning in November, 1937, which produced for several months after completion. M. L. Clement, testified that he drilled the well and bought the casing, the pumping unit, the derrick and the tub-

ing used. Whether, in so doing, he was acting for his own or Mrs. Clement's account, he does not state and the record does not otherwise make plain.

"However, by an instrument dated April 5, 1939, and duly recorded, executed by Mrs. O. P. Clement, Assignor, and M. L. Clement, Assignee, the following agreement was made:

" 'In consideration of M. L. Clement, drilling and completing a well on said land for oil and gas purposes, and in consideration of said assignee's compliance with the terms and conditions of said oil, gas and mineral lease, and the terms and conditions in the assignment by the Gulf Refining Company to the said Mrs. O. P. Clement, assignor herein, does sell, convey, assign, transfer and deliver unto the assignee herein *all of the oil and/or gas that may be produced from the aforesaid lease,* which the said Mrs. O. P. Clement may be entitled to receive under and by virtue of the terms and stipulations in the original lease from the said Caddo Levee Board to the Gulf Refining Company, and the assignment from the Gulf Refining Company to the said Mrs. O. P. Clement.'

"It will be noted that this was not an assignment of Mrs. Clement's sub-lease, but merely a conveyance of all of the oil and/or gas that she might be entitled to receive thereunder. M. L. Clement acquired no interest in the leasehold. The parties obviously resorted to this type of

agreement in an effort to circumvent and evade 'the non-transferable' clause in the sub-lease from the Gulf to Mrs. Clement. 'The drilling and completing a well' on the land by M. L. Clement refers not to the No. 1 Well already drilled, as heretofore stated (as same had been long since abandoned), but to another well to be drilled and to be known as Well No. 2, for we find M. L. Clement thereafter undertaking to make the necessary financial arrangements to do so.

"First, on May 16, 1939, M. L. Clement, claiming to own 2200 feet of 6-inch casing; one type 14 Jensen Unit; one 88-ft. derrick and 2300 feet 2½-inch tubing, all located on the North one hundred acres of Section 5 (the land covered by Mrs. O. P. Clement's sub-lease), mortgaged said property for $700.00 to secure his note to future holder for that amount, dated with the act of mortgage and due five months after date. He borrowed a sum of money from the Oil City Bank giving therefor his note for $800.00 dated October 17, 1939, to secure the payment of which he pledged the $700.00 mortgage note above described. He testified that he took Mr. Roberts, of the Oil City Bank, to the Well No. 1 to show him said equipment then located in and on the said well.

"Second, by an instrument dated September 6, 1939, which set forth by reference the Gulf Refining Company lease, the sub-lease to Mrs. O. P. Clement, the conveyance from Mrs. O. P. Clement to M.

L. Clement, and stated that M. L. Clement was 'the owner of all the oil that may be produced from said lease' M. L. Clement and A. J. Dupuy, one of the plaintiffs herein, contracted as follows:

" 'In consideration of the sum of One Hundred ($100.00) Dollars, cash in hand paid, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the said M. L. Clement, has and does by these presents grant, bargain, sell, convey and assign unto and in favor of the said A. J. Dupuy, an undivided one-half (½) of all his right, title and interest in and to the above mentioned oil and gas lease, together with a like interest in all of the oil which the said M. L. Clement is entitled to receive therefrom, under and in accordance with the provisions of the hereinabove mentioned transactions.

" '*It is understood and agreed that this sale and assignment does not include any of the drilling or pumping equipment placed on the above described lease by the vendor herein, but said vendor agrees that he will equip said lease for the production of oil or gas, and agrees that he will use said equipment on said lease so long as oil or gas may be produced therefrom in paying quantities.*'

"The real consideration for this contract is explained by Dupuy in this testimony, as follows:

\*    \*    \*    \*    \*    \*

" 'A. I finally came to an agreement (with Clement) and agreed to put up some money to drill a well if he would provide and do certain things himself.

" 'Q. What was he supposed to do? A. He was supposed to furnish a drilling rig and he was supposed to furnish a derrick which was on Well No. 1, a little west from where we intended to drill Well No. 2, and anything else he could furnish me that he had on the lease.

" 'Q. Now who paid for the drilling of that well? A. I did.

\*    \*    \*    \*    \*    \*

" 'Q. Now Mr. Dupuy, you first bought an interest in the *oil rights* or half interest in September, 1939, from Mr. Clement, I believe? A. I think that is what the record shows. That must be correct.

" 'Q. Do you remember what the consideration was that you paid him for that?

\*    \*    \*    \*    \*    \*

" 'A. My agreement was \* \* \* to be *the amount of money that it took to drill that well, paying the labor and different things like that Mr. Clement could not furnish.*

" 'Q. In other words, you agreed to finance the drilling of the new well, is that it? A. *Yes,* I would say outside of what he could furnish. He was to help me in any way and form it was possible for him to help.' (Italics and brackets ours.)

"The Well No. 2 was then started in December, 1939, and completed around

the first of January, 1940, and pumping equipment placed thereon. Some oil was pumped out of the well into a leaky storage tank on the lease, part of which was used in the well in an endeavor to 'clean it' and the rest leaked out of the tank and was lost. Both Clement and Dupuy testified that the pumping equipment was constantly 'going bad' and they were never able to run any oil into the pipe line.

"After weeks of unsuccessful efforts to produce and run oil from this well M. L. Clement executed unto and in favor of J. E. Sandefur an instrument dated February 7, 1940, referring to the Gulf lease, the sub-lease to Mrs. O. P. Clement, and the conveyance by Mrs. O. P. Clement to M. L. Clement and reciting that 'the said M. L. Clement is owner of all the oil that may be produced from said lease' and providing:

"'In consideration of $50.00 cash in hand paid and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the said M. L. Clement has, and does by these presents grant, bargain, sell, transfer, assign, convey and deliver unto the said J. E. Sandefur all of his undivided one-half interest acquired by him in the oil produced from said leased premises free of all operating expenses and any and all costs in connection with the drilling and operating of said lease.

"'It is agreed and understood by the parties that this sale and assignment does not cover and include any of the drilling, pumping or other equipment on said lease or that may hereafter be placed thereon, but the said M. L. Clement, Assignor herein, agrees that he will use said equipment on said lease so long as oil or gas may be produced in paying quantities.'

"Having thus divested himself of all his interest in the oil from the lease, M. L. Clement testified that he stayed on and around the lease until about March or April, 1940, when he left the lease, but continued his efforts 'To make a deal to protect that 100 acres * * * to take care of that lease.'

"By instrument Phfee-Fee Farms, Inc., acquired from A. J. Dupuy and J. E. Sandefur the interest they had acquired from M. L. Clement as hereinabove shown. Phfee-Fee Farms, Inc., one of the plaintiffs, is A. J. Dupuy's holding corporation, organized by him and practically all of the capital stock of which he owns.

"By instrument Phfee-Fee Farms, Inc. sold to J. L. Polk, the other plaintiff herein, 'an undivided one-fourth of all the oil, gas and other minerals that may be produced under and in accordance with the terms' of the Gulf Refining Company lease, in so far as same affects the North 100 acres.

"Defendant, Oil City Bank, had, on January 29, 1940, filed suit No. 78,653 on the docket of this Court, heretofore re-

ferred to, against M. L. Clement seeking judgment against him on his $800.00 note held by it and foreclosing the chattel mortgage securing the $700.00 note pledged by him to the bank. This mortgage described the property mortgaged as being '2,200 feet 6-inch casing; one type 14 Jensen Unit; one 88-ft. derrick and 2300 feet, more or less, 2½-inch tubing, all located on the North one hundred acres of Section 5, Twp. 20 N. Range 16 West, Caddo Parish, Louisiana.'

"Judgment dated June 29, 1940, was rendered in favor of Oil City Bank and against M. L. Clement for $800.00 and recognizing the rights of the bank, as pledgee, to the lien and privilege on the described property. The writ of fieri facias was issued July 15, 1940, and under it, the Sheriff returned that he had seized property described as '2200 ft. more or less of 6-inch casing; One type 14 Jensen Unit; one 88-ft. derrick; 2300, more or less, 2½-inch tubing, all located on the North ten acres of Section 5, Twp. 20 N. R. 16 West, Caddo Parish, Louisiana.'

"The evidence shows that Dupuy, personally, and through his attorney, Mr. Ralph Baucum, protested to the bank, the bank's attorney and the sheriff that the property so seized was not the property of Clement, but that the same was claimed to be owned by plaintiffs. Nevertheless, the sale was proceeded with and on August 21, 1940, the property was sold

by the sheriff to the Oil City Bank and, by instrument dated September 10, 1940, the bank sold the same to H. T. Manning, without warranty.

"Buck Horton, a witness for the defense, testified that, acting for H. T. Manning and D. I. Daniels, he went to the leased premises and pulled the casing, tubing and rods, recovering 900 feet of 6-inch casing and approximately 2300 feet of tubing and rods, which Manning and Daniels had hauled away. What became of the derricks, the Jensen Unit and the other equipment on the lease is not shown, although Dupuy testified that when he went back on the lease some time after the sale to the bank, 'there was not anything there at all, just a hole in the ground.'

"Upon the record as we thus find it, we are of the opinion that plaintiffs never acquired ownership of the sub-lease acquired by Mrs. O. P. Clement, from the Gulf Refining Company, although they allege ownership thereof and on trial offer and rely upon the documents heretofore discussed to establish their title. Having thus plead and established their title, they are surely bound thereby, and it is difficult for the Court to understand the statement on page 1 of the supplemental brief of plaintiffs' counsel to the effect:

" 'We refuse to discuss the question of whether or not the plaintiffs owned a sub-lease an assignment or what the nature of their rights were.'

"As we see it, their right to recover herein depends upon the nature of the rights they acquired. All that plaintiffs acquired under their contracts was the right to the oil that might be produced from the lease premises. All that M. L. Clement acquired from Mrs. O. P. Clement, was the oil or gas that might be produced from the leased premises. Plaintiffs acquired from M. L. Clement, and, of course, could acquire no greater right than he had. They acquired no ownership in the sub-lease or the wells thereon. Neither did they acquire any ownership of the equipment on the lease, because M. L. Clement, in the conveyances to Dupuy and the conveyance to Sandefur, expressly excluded from said sales all equipment then or thereafter to be placed on the lease. By these instruments Clement retained ownership of the equipment agreeing only that 'he will equip said lease for the production of oil or gas and agrees that he will use said equipment on said lease as long as oil or gas will be produced therefrom in paying quantities.'

"It is true that A. J. Dupuy, purchased and paid for some of the casing, tubing etc., and furnished some money to drill the Well No. 2, but, as heretofore shown, he contracted to do that in payment of, or as a consideration for M. L. Clement's transfer to him of one-half of the oil that might be produced from the leased premises. In other words, Dupuy furnished to Clement some funds and equipment to drill the well and Clement, in consideration therefor, sold Dupuy one-half of the oil that might be produced. The equipment was Clement's property and he was careful to exclude any interest therein from his sales to Dupuy and Sandefur.

"We hold, therefore, that the documentary evidence offered by plaintiffs to support their alleged title to the sub-lease and the equipment thereon, instead of doing so, clearly establishes that they never acquired any title to either, and further established title to all the equipment in M. L. Clement. It was therefore properly seized, as is proper, under a writ of fieri facias issued in execution of the bank's personal judgment against him, whether covered by the bank's chattel mortgage or not.

"Plaintiffs claim for damages for equipment removed, the first item of damages claimed, must therefore be denied.

"Likewise, since plaintiffs acquired no ownership in the sub-lease, they can claim nothing for the estimated cost of drilling still another well which they allege to be necessary to hold the sub-lease, the third item of damages claimed.

"As to the claim for damages for the value of the well alleged to have been destroyed, included in the second item of damages, the well was an integral part of the sub-lease, and not being owned by these plaintiffs they cannot claim its

value. Furthermore, this claim and the claim for the value of the oil that might be produced from said well, of which plaintiffs claim to have been deprived, are entirely too speculative in character and the proof offered in support thereof too inadequate to support money judgment therefor.

"The evidence shows that not a drop of oil was ever run from this well into any pipe line, no accepted gauge of production ever made, no test of any kind acceptable and commonly used in the industry as a basis for value was ever made. The No. 1 Well one hundred feet North on the same lease, produced over a period of several months a total of about ninety-eight barrels and was then abandoned. To estimate the value of such a well, alleged to be 'a commercial producer,' or of the amount of oil that might be produced therefrom would be pure conjecture which could not afford a basis for judgment."

Counsel in argument in this court, both orally and in brief, still persist in their refusal to discuss the question of the nature of the rights of the plaintiffs, whether they owned a sub-lease, an assignment, or what other interest, contending that "So far as the defendant is concerned it is immaterial. The plaintiffs drilled the well and the effect of the defendant's tortious acts was to deprive the plaintiffs of a well which they owned and possessed * * *."

■ Therein, we think, lies the fallacy upon which this action is founded for these plaintiffs, having deraigned their title by mesne conveyances only acquired such rights as their ancestor in title, M. L. Clement, had to convey, that is, "all of the oil and/or gas that may be produced or saved from" the sub-lease given Mrs. O. P. Clement by the Gulf Refining Company, and they could not have acquired any other title or interest in or to such lease. They acquired nothing more than the right to the prospective production from such lease.

It necessarily follows that the only right the plaintiffs have to damages, if any, is for the value of such production, which claim, as found by the trial judge, is "entirely too speculative in character and the proof offered in support thereof too inadequate to support money judgment therefor."

■ The plaintiffs' contention that the defendants' seizure and sale of the pipe and other equipment purchased and paid for by Dupuy, whose interest they acquired therein, constituted a tortious conversion of their property is also based on a false premise for the "other valuable consideration" given by Dupuy for his acquisition of half of the prospective production of this lease, recited in the instrument as the consideration given in addition to the $100 stipulated, was, as testified to by Dupuy himself, "to be the amount of money it took to drill that

well, *paying the labor and different things* * * * *Mr. Clement could not furnish."* In other words, he agreed to finance the drilling of this well, which necessarily included the purchase of the pipes, casings and other such equipment needed for the drilling of the well, for what he was getting—the prospective production from the lease. And since the record unmistakably shows the well did not produce in paying quantities, Clement was relieved of his agreement to leave such equipment on the premises and the plaintiffs cannot complain about the seizure and sale thereof, even though the chattel mortgage did not affect some of this equipment.

For the reasons assigned the judgment appealed from is affirmed, at the cost of the appellants.

O'NIELL, C. J., absent.